IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISON

| | |
|---|---|
| WAR EAGLE FARMS, LLC and KATE'S HOPE, LLC (d/b/a COLDWATER PLANTING COMPANY, a General Partnership), and WILLIAM BRENNAN CHAPMAN | |
| HUBERT EVANS WOLFE, JR., KRISTOPHER WOLFE, ARTHUR WOLFE, HKA, INC. and WWW, INC. (d/b/a BRAZIL PLANTING COMPANY, a General Partnership) | |
| WILL, INC., PAT, INC. and ASHELY DEAN, INC. (d/b/a PUSHEN & PULLEN FARMS, a General Partnership) | |
| J.J. WEBB, III, J.J. WEBB, IV and WEBB & WEBB, INC. (d/b/a WEBB FARMS, a General Partnership) | |
| KENNY WEEKS and SHERRY WEEKS (d/b/a M&W FARMS, a General Partnership) | PLAINTIFFS |
| VS. | CAUSE NO.: 4:22cv58-DMB-JMV |
| AMERICAN AGRI-BUSINESS INSURANCE CO. and AGRISOMPO NORTH AMERICA, INC. and JOHN DOES 1-10 | DEFENDANTS |

**COMPLAINT**
*Jury Trial Demanded*

COME NOW, Plaintiffs and file this Complaint against the named Defendants for fraud, misrepresentation, negligence, gross negligence, breach of contract, tortious breach of contract, bad faith and systemic bad faith, stating as follows:

I. PARTIES

1.     Plaintiffs War Eagle Farms, LLC and Kate's Hope, LLC are the sole and only owners of Coldwater Planting Company, a General Partnership. Mary Grace Chapman and Plaintiff

William Brennan Chapman are adult resident citizens of Mississippi, and are the sole and only owners of War Eagle Farms, LLC and Kate's Hope, LLC.

2. Plaintiffs Hubert Evans Wolfe, Jr., Kristopher Wolfe, Arthur Wolfe, HKA, Inc. and WWW, Inc. are the sole and only owners of Brazil Planting Company, a General Partnership. Hubert Evans Wolfe, Jr., Kristopher Wolfe and Arthur Wolfe are adult resident citizens of Mississippi, and HKA, Inc. and WWW, Inc. are corporations organized and existing under the laws of Mississippi, with a principal place of business at 111 E. Court Street, Sumner, Mississippi.

3. Plaintiffs Will, Inc., Pat, Inc. and Ashely Dean, Inc. are the sole and only owners of Pushen & Pullen Farms, a General Partnership (which is sometimes referred to as P&P Farms). Will, Inc., Pat, Inc. and Ashely Dean, Inc. are corporations organized and existing under the laws of Mississippi, with a principal place of business at 208 Cassidy Street, Sumner, Mississippi.

4. Plaintiffs J.J. Webb, III, J.J. Webb, IV and Webb & Webb, Inc. are the sole and only owners of Webb Farms, a General Partnership. J.J. Webb, III and J.J. Webb, IV are adult resident citizens of Mississippi, and Webb & Webb, Inc. is a corporation organized and existing under the laws of Mississippi, with a principal place of business at 120 E. Court Street, Sumner, Mississippi.

5. Plaintiffs Kenny Weeks and Sherry Weeks are adult resident citizens of Mississippi, and are the sole and only owners of M&W Farms, a General Partnership.

6. Defendant American Agri-Business Insurance Co. ("AABIC") is a foreign corporation organized and existing under the laws of Texas, with a principal place of business at 7101 82nd Street, Lubbock, Texas.

7.  Defendant AgriSompo North America, Inc. ("AgriSompo") is a foreign corporation organized and existing under the laws of Texas, with a principal place of business at 7101 82nd Street, Lubbock, Texas.

8.  Defendants John Does 1-10 are those persons or entities that may be liable for the claims alleged on grounds that they committed the complained of conduct, or directed, authorized or empowered the named defendants to commit the complained of conduct, but whose identities or roles are unknown and cannot be determined without discovery.

## II. JURISDICTION & VENUE

9.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

10. Venue is proper pursuant to 28 U.S.C. § 1391, as this is a judicial district in which a substantial part of the acts or omissions giving rise to the claims occurred.

## III. FACTUAL ALLEGATIONS

11. Plaintiffs are agricultural producers of corn operating separate farms in Leflore County, Mississippi, Tallahatchie County, Mississippi and Quitman County, Mississippi.

12. The claims in this case arise out of a denial of benefits under an insurance policy.

13. AABIC is the drafter of the insurance policy at issue.

14. ARMtech Insurance Services, Inc. ("ARMtech") and CGB Diversified Services, Inc. are listed on the policy as its service providers.

15. ARMtech was founded in Iowa in 1999 and acquired AABIC in 2003.

16. Endurance Specialty Holdings, Ltd. ("Endurance") acquired ARMtech and its operating subsidiaries in 2007.

17. Sompo Holdings, Inc. acquired Endurance and its subsidiaries in 2017 then formed and began to operate as Sompo International Holdings, Ltd. ("Sompo Int'l.").

18. Sompo Int'l. acquired Diversified Crop Insurance Services ("DCIS"), a subsidiary of CGB Enterprises, Inc., on December 28, 2020, after which ARMtech and DCIS began to operate as a combined entity under the brand name AgriSompo.

19. ARMtech changed its legal name to AgriSompo in 2021, first in Texas (effective June 21, 2021) and then in Iowa (effective June 30, 2021).

20. AABIC and AgriSompo are commonly owned entities sharing a single business address: 7101 82nd Street, Lubbock, Texas.

21. Under the circumstances, it reasonably appears AABIC is no more than an alias, alter ego or pseudonym of AgriSompo.

22. Alternatively, if AABIC and AgriSompo are legally and factually separate entities then these corporations engaged in a civil conspiracy together for the purpose of defrauding Plaintiffs and wrongfully denying benefits owed on a valid claim.

23. Whether as a *de facto* single entity or as co-conspirators, AABIC and AgriSompo acted together for a common purpose, and therefore are collectively referred to herein as "Defendants."

24. Defendants are among the largest sellers and servicers of crop insurance in the country.

25. Farms are heavily dependent on reliable weather conditions to deliver a return and, as a result, an unexpected weather event can wipe out a farmer's entire investment.

26. Crop insurance is a form of coverage sold to farmers to protect the price and/or yield risk associated with farming, including the risk posed by unexpected weather events.

27. Crop insurance acts as an irreplaceable safety net for farmers, making it possible for them to shoulder the risk associated with their farming operations season after season.

28. There are two primary types of crop insurance: multiple peril crop insurance ("MPCI") and crop hail insurance.

29. Although MPCI is a federally supported and regulated part of the Federal Crop Insurance Program, it is sold and serviced by private crop insurers like Defendants.

30. When MPCI claims are made, the federal government acts as a reinsurer, meaning it insures private crop insurers like Defendants.

31. If a private crop insurer's claim payments exceed the premium it has collected, the federal government shares in the losses, and if the insurer collects more in premiums than it pays in claims, the federal government shares in the gains.

32. Unlike MPCI, crop hail insurance is not part of the Federal Crop Insurance Program.

33. Since crop hail insurance is not federally subsidized, the federal government does not act as a reinsurer when claims are made.

34. Private crop insurers face more risk when writing crop hail policies but stand to make larger profits in years when fewer claims are paid.

35. As a result, private crop insurers are motivated to keep claim payouts low.

36. In 2020, Plaintiffs each purchased a crop hail insurance policy and supplemental crop insurance policy from Defendants (the "crop hail policy" or "policy") to insure against risk of loss in the 2021 crop year. *See* 2021 Crop Hail Insurance Rates and Rules, 2021 Crop Hail Insurance Policy and 2021 Supplemental Crop Insurance Policy attached collectively as Ex. A.

37. The crop hail policy included an optional "wind plus" endorsement (the "endorsement").

38. The purpose of the endorsement was to add specified perils, including "green snap," to the policy coverage in return for the payment of an additional premium.

39. Plaintiffs each paid the additional premium to secure the expanded coverage offered by the endorsement then suffered damages as a result of "green snap" when a number of their corn stalks were severed or broken by wind prior to harvest.

40. Plaintiffs each presented a valid claim for benefits and Defendants denied each claim.

41. Defendants attempted to justify their refusal to pay any portion of each claim by alleging water played an indirect role in causing the corn stalks to become severed or broken.

42. Defendants' denial lacks factual support and is not supported by the definitions or exclusions found in the endorsement or any other term or condition found in the policy.

43. The definitions contained in the endorsement state that "green snap" occurs when a corn stalk is "severed or broken above the brace root and below the ear node from wind such that an ear is prevented from forming or the ear cannot be mechanically harvested," and the exclusions contained in the endorsement state that there is no coverage for a corn "stalk that has not been severed or broken."

44. The damage to each Plaintiff's 2021 corn crop meets the definition of "green snap" because the corn stalks in question were "severed or broken above the brace root and below the ear node from wind" such that ears were either "prevented from forming" or could not "be mechanically harvested."

45. The definitions of "green snap" and "direct damage" each state that the corn "stalk must be free of insect, disease, animal or chemical damage."

46. The damage to each Plaintiff's 2021 corn crop meets the definitions of "green snap" and "direct damage" because the corn stalks in question were "free of insect, disease, animal or chemical damage."

47. The definition of "direct damage" includes "green snap, ears of corn on the ground, [and] ears of corn on laid over stalks that cannot be mechanically harvested."

48. The damage to each Plaintiff's 2021 corn crop meets the definition of "direct damage" because the corn stalks in question were damaged by "green snap," or can be fairly described as

"ears of corn on the ground," or can be fairly described as "ears of corn on laid over stalks that cannot be mechanically harvested."

49. The exclusions contained in the endorsement state that coverage is not provided for reduced yield due to the following types of "indirect damage":

     i.     Tipped or elbowed stalks when ears are recovered.
     ii.    Failure to Pollinate.
     iii.   Insect, Disease, Animal, or Chemical Problems.
     iv.   Ear Size or Ear Drop.
     v.     Defoliation.
     vi.   Barren Stalks.
     vii.  All indirect damage.

50. Water is not one of the types of "indirect damage" listed in the endorsement.

51. Defendants knew or should have known any ambiguity in the endorsement would be strictly construed against them because, as the drafter of the policy, AABIC was in a position to correct the ambiguity.

52. Defendants knew or should have known the maxim *expressio unius est exclusio alterius* would apply to the types of indirect damage listed in the endorsement.

53. If Defendants desired to exclude coverage anytime it could be argued that water played a role in causing a loss, they could have done so, as they did when excluding "loss due to flood or excessive water" in the "harvested grain coverage" endorsement available with the policy.

54. Defendants knew or should have known their claim denial was not supported by the facts, the policy or the endorsement, but they still refused to make any payment whatsoever.

55. After Plaintiffs filed their claims, Defendants engaged in a pattern of conduct designed and intended to defraud Plaintiffs and discourage any further pursuit of the claims.

56. Among other things, Defendants tried to coerce Plaintiffs into executing a withdrawal, release or waiver of their claims to the policy benefits then attempted to convince Plaintiffs that binding, non-judicial appraisal was the only means of resolving the coverage disputes.

57. Defendants' interpretation of the policy and its endorsement is dishonest and self-serving, in violation of the express terms of the contract and the implied covenant of good faith.

58. Plaintiffs have not received the benefit of the bargain struck when they each paid an additional premium for the expanded coverage supposedly provided by the endorsement.

59. Defendants, either as a *de facto* single entity or as co-conspirators, have caused financial injury and other damages to Plaintiffs including, but not limited to, an unnecessary delay in the preparation of each Plaintiff's fields for the 2022 season.

## IV. CAUSES OF ACTION

### Fraud and Misrepresentation

60. Plaintiffs re-allege and incorporate each allegation made above as if fully set forth herein.

61. Defendants could have used clear and unambiguous language when drafting the policy and endorsement but intentionally used ambiguous language such as "any other indirect damage" to deceive and mislead Plaintiffs with regard to the scope and availability of coverage.

62. Defendants knew when they wrote the "wind plus" endorsement that they would refuse to pay a claim if it could be argued that water played an indirect role in the loss but purposefully failed to inform Plaintiffs of this fact.

63. Alternatively, Defendants engaged in post-claim underwriting by waiting until Plaintiffs' claim was filed to fraudulently decide that they would refuse to pay a claim if it could be argued that water played an indirect role in the loss.

64. After Plaintiffs filed their claims, Defendants misrepresented facts concerning the cause of the loss and the compensability of Plaintiffs' damages under the endorsement then attempted to coerce Plaintiffs into withdrawing, releasing or waiving their claims.

65. Additionally, Defendants misrepresented that Plaintiffs were required to participate in a binding, non-judicial appraisal process to determine whether coverage existed for their claims then attempted to manipulate that process.

66. Mississippi law holds that the appraisal provision of an insurance policy cannot be used to decide coverage questions because appraisers are not arbiters and, accordingly, have no power to arbitrate insurance disputes other than to value the damages at issue.

67. Defendants knew appraisal could not be used to decide a question of coverage, but misrepresented the scope and purpose of the provision in an attempt to coerce Plaintiffs into accepting a binding, non-judicial resolution of their claims.

68. While falsely insisting that binding appraisal was a legal and required means of deciding coverage questions, Defendants failed to abide the terms of their own appraisal provision by claiming they were entitled to select the umpire who would decide the dispute if an agreement could not be reached by the appraisers selected by the parties.

69. Additionally, Defendants misrepresented that the umpire was required to be a person with insurance industry expertise as opposed to a farmer or other qualified person.

70. Plaintiffs suffered actual and consequential damages due to Defendants' acts of fraud and misrepresentation, and/or acts of post-claim underwriting, and are entitled to special damages.

Negligence and Gross Negligence

71. Plaintiffs re-allege and incorporate each allegation made above as if fully set forth herein.

72. Defendants were obligated to use reasonable care, as well as their particular knowledge, skill and experience, to investigate, handle and adjust Plaintiffs' claims but failed to do so.

73. Defendants breached their duty to Plaintiffs when, in connection with their work on the claims, they committed acts of negligence that resulted in the denial of valid claims for benefits.

74. Defendants' negligence was accompanied by conduct amounting to gross negligence, malice or reckless disregard for Plaintiffs' rights.

75. Plaintiffs suffered actual and consequential damages due to Defendants' negligence and gross negligence in the investigation and handling of the claims, as well as their reckless disregard of Plaintiffs' rights, and are entitled to special damages.

## Breach of Contract and Tortious Breach of Contract

76. Plaintiffs re-allege and incorporate each allegation made above as if fully set forth herein.

77. Each Plaintiff's 2021 corn crop suffered damages compensable under the expanded coverage provided by the "wind plus" endorsement to the policy.

78. Each Plaintiff opened a timely and compensable claim with Defendants.

79. Defendants were obligated to look for ways to pay the benefits provided by the policy and endorsement but instead only looked for ways to deny the claims.

80. Defendants breached the contract of insurance when they refused to pay Plaintiffs' valid claims, and such breach was accompanied by an intentional wrong, insult, abuse or such gross negligence as to rise to the level of an independent tort.

81. Defendants' intentional and wrongful conduct in this case includes, but is not limited to, those acts alleged in support of Plaintiffs' claims for fraud, misrepresentation, negligence and gross negligence *supra* and Plaintiffs' claims for bad faith and systemic bad faith *infra*.

82. Plaintiffs suffered actual and consequential damages due to Defendants' breach of contract and tortious breach of contract, as well as their related intentional and wrongful conduct, and are entitled to special damages.

### Bad Faith and Systemic Bad Faith

83. Plaintiffs re-allege and incorporate each allegation made above as if fully set forth herein.

84. Regardless of whether Defendants breached the express terms of the policy, their actions constitute a breach of the implied contractual covenant of good faith.

85. Good faith requires faithfulness to the purposes for which the policy and endorsement were purchased, i.e. to protect against loss if any Plaintiff's crop was damaged by "green snap."

86. Plaintiffs performed their contractual obligations under the policy and its endorsement and were justified in expecting Defendants to perform their obligation to pay the claims.

87. The covenant of good faith and fair dealing was breached when Defendants refused to pay Plaintiffs' valid claims, thereby injuring their right to receive the benefit of the agreement.

88. Defendants are engaged in a pattern and practice of systemic and on-going bad faith.

89. Defendants liberally underwrite crop hail policies and amendatory endorsements like the ones at issue, only to delay or deny the payment of benefits after valid claims are reported.

90. Defendants engage in post-claim underwriting and intentionally use ambiguous language in their policies and endorsements despite the asymmetrical bargaining positions of the parties and the fact that insurance contracts are contracts of adhesion which cannot be negotiated.

91. Defendants publish false and misleading information on their website and elsewhere which is intended to induce agricultural producers into purchasing crop insurance policies and paying additional premiums for expanded coverage.

92. The advertising and marketing information published by Defendants tells agricultural producers to rest easy because, with crop insurance in place, an unexpected weather event will not destroy a year or lifetime's worth of financial security.

93. The advertising and marketing information published by Defendants tells agricultural producers the peace of mind provided by crop insurance will allow them to market their crops with confidence, spend funds on best farming practices and expand their business operations.

94. The advertising and marketing information published by Defendants assures agricultural producers, if the worst happens and a major crop loss occurs, Defendants' adjusters will verify the damage to ensure payment is made and losses are offset.

95. The advertising and marketing information published by Defendants assures agricultural producers that crop insurance claims will be paid within a matter of days, quickly getting them back on their feet and preparing to plant their next crop.

96. Defendants' representations and assurances when advertising and marketing their crop insurance products are intentionally false.

97. Defendants profit from this scheme by collecting premiums for policy benefits they never intend to pay then avoiding their obligations after valid claims are made.

98. Defendants' insistence on a withdrawal, release or waiver of claims if they decide a loss is not payable is further evidence of systemic, on-going bad faith.

99. When insisting that insureds withdraw, release or waive claims, Defendants point to the "General Provisions" contained in the policy which state:

> 3. DUTIES AFTER LOSS.
>   a. *Your Duties Are:*
>     In case of a probable loss to crops insured under this policy you must:
>
> \* \* \*

> (6) Sign a Withdrawal of Claim when our inspection of the crop determines that there is no payable loss under the terms of this policy.

100. Defendants know insisting on a "withdrawal of claim" has been used as evidence of malice and bad faith in other jurisdictions where they market, advertise and sell crop insurance.

101. Plaintiffs and other similarly situated agricultural producers have suffered actual and consequential damages due to Defendants' bad faith and systemic bad faith conduct, and are entitled to special damages.

## V. DAMAGES

102. As a direct and proximate result of the conduct alleged herein and that which may be further shown at the trial of this matter, Plaintiffs are entitled to the following damages:

    a) Contractual damages;

    b) Actual, compensatory, consequential and special damages;

    c) *Veasley* damages including reasonable attorney's fees and expenses;

    d) Punitive damages; and

    e) Any and all other damages to which Plaintiffs may be entitled.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek a judgment in an amount in excess of the $75,000.00 minimum jurisdictional limit of this Court, to be determined by a jury at the trial of this matter, along with all costs of this action, plus pre- and post-judgment interest at the highest rate allowable by law. Plaintiffs further request any additional relief to which they may be entitled under the premises.

    Respectfully submitted,

    WAR EAGLE FARMS, LLC and KATE'S HOPE, LLC
    (d/b/a COLDWATER PLANTING COMPANY,
    a General Partnership), and WILLIAM BRENNAN
    CHAPMAN

        HUBERT EVANS WOLFE, JR., KRISTOPHER WOLFE, ARTHUR WOLFE, HKA, INC. and WWW, INC. (d/b/a BRAZIL PLANTING COMPANY, a General Partnership)

        WILL, INC., PAT, INC. and ASHELY DEAN, INC. (d/b/a PUSHEN & PULLEN FARMS, a General Partnership)

        J.J. WEBB, III, J.J. WEBB, IV and WEBB & WEBB, INC. (d/b/a WEBB FARMS, a General Partnership)

        KENNY WEEKS and SHERRY WEEKS (d/b/a M&W FARMS, a General Partnership)

        */s/ Lawrence J. Tucker, Jr.*
        H. SCOT SPRAGINS, MSB #7748
        LAWRENCE J. TUCKER, JR., MSB #100869
        Hickman, Goza & Spragins, PLLC
        Post Office Drawer 668
        Oxford, MS 38655-0668
        (662) 234-4000 (telephone)
        (662) 234-2000 (facsimile)
        sspragins@hickmanlaw.com
        ltucker@hickmanlaw.com

OF COUNSEL:

RALPH E. CHAPMAN, MSB #5962
Chapman, Lewis & Swan, PLLC
P. O. Box 428
Clarksdale, MS 38614
(662) 627-4105 (telephone)
(662) 627-4171 (facsimile)
ralph@chapman-lewis-swan.com